1   NICHOLAS A. TRUTANICH
    United States Attorney
2   Nevada Bar Number 13644
    CHRISTOPHER BURTON
3   Assistant United States Attorney
    Nevada Bar Number 12940
    District of Nevada
4   Nevada Bar No. 12940
    501 Las Vegas Boulevard South, Suite 1100
5   Las Vegas, Nevada 89101
    PHONE: (702) 388-6336
6   Christopher.Burton4@usdoj.gov

7   *Attorneys for the United States of America*

8
           **UNITED STATES DISTRICT COURT**
9              **DISTRICT OF NEVADA**

10

| | 2:20-mj-482-NJK |
|---|---|
| UNITED STATES OF AMERICA, | **Magistrate No.** |
| Plaintiff, | **CRIMINAL COMPLAINT** |
| vs. | VIOLATION: |
| | 18 U.S.C. § 912 - False Personation of an Officer or Employee of the United States |
| ZACHARY SANNS, | |
| Defendant. | |

16      BEFORE the United States Magistrate Jude, Las Vegas, Nevada, the undersigned

17 complainant, being duly sworn, deposes and states:

18                    <u>COUNT ONE</u>
        False Personation of an Officer or Employee of the United States
19                  (18 U.S.C. § 912)

20      On or about May 30, 2020, in the State and Federal District of Nevada,

21                     ZACHARY SANNS,

22 defendant herein, did falsely assume and pretend to be an officer and employee of the United

23 States acting under the authority thereof, that is a Special Agent of the Department of

24 Homeland Security Investigations, and an employee of the State Department, and a

1  Department of Defense contractor, and in such assumed and pretended character did act as

2  such, in that he falsely stated that he was a federal law enforcement officer and a federal agent

3  and sought to assist in a Las Vegas Metropolitan Police Department response to protests and

4  civil unrest, all in violation of Title 18, United States Code, Section 912.

5  **PROBABLE CAUSE AFFIDAVIT**

6  I, Daniel Yun, being duly sworn upon oath, do hereby depose and state the following:

7  1.     I am a Special Agent ("SA") with the United States Department of Justice,

8  Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  I have been an ATF Special

9  Agent since September 2012.  Prior to working for ATF, I was employed as a Captain in the

10  United States Army.  I have received training in federal firearms and narcotics laws and

11  regulations at the ATF National Academy and Federal Law Enforcement Criminal Investigator

12  Training Program.  I have investigated numerous cases involving federal firearms violations,

13  involving unlawful sales, possession, manufacturing, and transportation of firearms. I have

14  acquired knowledge and experience as to firearms and ammunition and the interstate nexus of

15  firearms and ammunition, due to investigations, research, records, familiarity, conferring with

16  other experts, training, teaching, and certifications. I have participated in a variety of different

17  aspects of those investigations, including surveillance, undercover operations to conduct

18  controlled purchases of firearms and/or controlled substances, and the execution of search and

19  arrest warrants. I have been the affiant on affidavits for search warrants relating to firearms,

20  narcotics, and gang-related offenses.

21  2.     Because this Affidavit is being submitted for the limited purpose of securing a

22  Criminal Complaint, I have not included each and every fact known to me concerning this

23  investigation. I have set forth only those facts that I believe are necessary to establish probable

24  cause for the above listed offense. The information used to support this Complaint was derived

1   from reports of information obtained from eyewitnesses to the offenses described herein as well

2   as investigation conducted by law enforcement related to the incident. This Complaint contains

3   information necessary to support probable cause to believe that the criminal offenses described

4   herein were committed by the defendant, ZACHARY SANNS, and is not intended to include

5   each and every fact and matter observed by me or known to the Government. Moreover, to the

6   extent this Complaint contains statements by witnesses, those statements are set forth only in

7   part in substance and are intended to accurately convey the information, but not to be verbatim

8   recitations. In an attempt to anonymize certain individuals involved in this case their name and

9   other identifying information has been omitted. All times are approximate.

10   **FACTS ESTABLISHING PROBABLE CAUSE**

11        3.      On May 30, 2020, there were a number of protests in the Las Vegas valley in

12   response to the death of George Floyd. One of these particular protests was located in the area

13   of 7th Street and Fremont Street. Throughout the course of the evening, this protest turned to an

14   event of civil unrest with the crowd becoming unruly and violent towards officers. Las Vegas

15   Metropolitan Police Department (LVMPD) had established a Command Post in an effort to

16   coordinate a response to disperse the violent protesters. During this response, LVMPD Officers

17   from various parts of LVMPD's jurisdiction were called to assist the officers already present at

18   7th Street and Fremont Street. When the officers began arriving, an individual wearing "plain

19   clothes" (not in uniform) showed up behind the line of officers, known as the "skirmish line" of

20   officers creating a barrier between the crowd and the Command Post. The individual in plain

21   clothes had a tactical vest with magazine pouches and tactical patches, similar to something a

22   law enforcement officer would wear in a large-scale incident. In addition to the vest, the

23   individual had what appeared to be a ballistic helmet with night-vision goggles equipped.

24   Underneath the helmet, attached tactical hearing protection was worn with markings on the

1    side reading "215". The individual's face was covered by a balaclava style facemask. The

2    individual also had a gun belt similar to a police officer's duty belt with an unknown model

3    Glock pistol with an extended magazine and rubber bands wrapped around the handle, what

4    appeared to be an electronic control device (commonly known as a Taser which is a brand

5    name and not necessarily the exact make and model worn by the individual), two tourniquets,

6    and what appeared to be Oleoresin Capsicum (pepper spray). The individual also had an

7    unknown make/model AR-15 style rifle, with EOtech holographic sight and unknown

8    make/model optic magnifier, slung and was displayed in the front of his body similar to how

9    law enforcement and military carry their rifles when not in use but can be quickly accessed.

10   This individual and how he was dressed was documented by photographs taken by a reporter

11   team employed by the Las Vegas Review Journal (LVRJ). The manner in which this subject

12   was dressed is nearly identical to how a plainclothes local and federal law enforcement officer

13   would be in this situation. Additionally, the equipment used, specifically the night-vision

14   goggles and electronic control device, are difficult items to obtain and are normally issued by

15   specific sections of certain law enforcement agencies. The individual positioned himself behind

16   the "skirmish line" in an area reserved for law enforcement or anyone allowed by law

17   enforcement.

18        4.    During the incident on May 30, 2020, at 7th Street and Fremont Street, LVMPD

19   Deputy Chief (DC) Seebock observed the previously mentioned individual attempting to get to

20   the front of the "skirmish line." DC Seebock immediately saw the tactical hazard of an officer

21   with a slung rifle being at the front of a line in direct contact with violent protesters. DC

22   Seebock approached the individual and pulled him off of the front line and said specifically "I

23   don't need you on the front line with an AR-15." DC Seebock said he assumed the individual

24   was law enforcement because the manner he was dressed and the fact the individual was

4

1   behind the "skirmish line." DC Seebock also said he believed he saw a badge, possibly a federal

2   badge, on the subject. DC Seebock did not find this subject unusual due to his previous

3   experience in large scale critical incidents where federal law enforcement assists LVMPD. DC

4   Seebock specifically asked the individual "who are you with?" and although DC Seebock did

5   not recall the exact response, he recalled the subject stating something similar to being a

6   "federal officer." DC Seebock asked again specifically what federal agency the individual was

7   with and again he could not be certain but DC Seebock recalls the individual saying he was

8   with "HSI" or Homeland Security Investigations. Based on the totality of the circumstances

9   surrounding this individual and the way he was presenting himself, DC Seebock said that he

10  believed the person was in fact a federal law enforcement agent. DC Seebock was shown a

11  photograph taken by the LVRJ of the subject and DC Seebock said he was reasonably certain

12  the person was the same person he interacted with that night.

13       5.     Also during the incident on May 30, 2020, LVMPD Assistant Sheriff (AS) Jones

14  observed this same individual behind the "skirmish line." AS Jones described the clothing,

15  body armor, and weapons he remembered and they were the same as the photo taken by LVRJ.

16  Similar to the concerns of DC Seebock, AS Jones observed the rifle the individual had slung

17  across his chest. This concerned AS Jones and he approached the individual and asked him

18  "who are you with?" and the individual responded "I'm with the State Department, they

19  deployed us out here." AS Jones also said he could see a small portion of an emblem on the

20  gray t-shirt (mostly covered by the body armor) that he believed was a DHS (Department of

21  Homeland Security) insignia. After being confronted by AS Jones, the individual left the

22  immediate area and moved to an area AS Jones described as being by the LVMPD patrol cars

23  and he did not see him again for the rest of the event. Based on his discussion with and

24  observations of the individual, AS Jones believed the individual was federal law enforcement.

6.      On June 8, 2020, LVMPD Detective Morris of the Criminal Intelligence Section was made aware of the previously described individual due to a social media post by the LVRJ which showed the individual previously described during the protest event. The subject has his left arm extended and there is a distinct tattoo of "0351" with "SS" directly above. The SS font is the same font used by Nazi SS units in World War II. Detective Morris, upon seeing the tattoo, recognized the "0351" as a military occupational specialty (infantry) in the United States Marine Corps and the SS logo as an unauthorized and discouraged symbol used by some Marine Corps Scout Snipers. This photo could have an immediate impact due to the public seeing the symbol and speculating the person in the photo to be affiliated with Nazi or racist groups and ideology.

7.      On June 9, 2020, Detective Morris was contacted by personnel in LVMPD's Internal Affairs Bureau (IAB) and given a possible identity for the previously described individual. IAB stated they had a complainant who initially wanted to remain anonymous but was later identified as ZACHARY SANNS. SANNS had called in to report that LVMPD officers had blown kisses to his wife, who is also an LVMPD officer, during an event for which they were both present. There was no reason for SANNS to be on the event with his Police Officer wife in an area of town she does not work and he does not live. SANNS also alleged the officers on the scene used profanities towards him. The IAB investigation revealed SANNS' allegations were not true. When interviewed, the involved officers said SANNS identified himself as a federal officer but refused to show any credentials, only at one point slightly removing a white card briefly from his wallet before quickly putting it away. The IAB investigation cleared the officers of any wrongdoing. As a courtesy, IAB Sgt. Liles contacted SANNS to let him know the disposition of his complaint. When told the complaint would be closed, SANNS became agitated and irate, yelling at the Sgt. Liles. Attempting to calm

1    SANNS, Sgt. Liles thanked him for his military service and said although he did not know

2    which federal law enforcement agency he currently worked for, he respected that service as

3    well. SANNS responded to that comment that he works with the CIA.

4          8.     On a separate IAB interview which took place June 8, 2020, Sgt. Liles was

5    having a conversation with the LVMPD sergeant who supervises SANNS' wife. The sergeant

6    was telling Sgt. Liles about his frustrations with SANNS continuously coming to the police

7    station, showing up on his wife's assigned calls for service, and repeated attempts to include

8    himself in department training. The sergeant told Sgt. Liles about an incident where SANNS

9    self-deployed to an incident on the strip where the sergeant and his squad were assigned to

10   assist with civil unrest. The sergeant told Sgt. Liles that he believed SANNS is a federal law

11   enforcement officer although the sergeant has never seen any credentials. Later that day, the

12   sergeant was made aware of a complaint filed against LVMPD for an officer with an "SS

13   lightning bolt tattoo" on his arm during the May 30, 2020 protest. Sgt. Liles believed this

14   person to be SANNS, the person the sergeant described as self-deploying to the civil unrest

15   incident.

16         9.     On June 9, 2020, Detective Morris spoke with the sergeant of SANNS' wifes'

17   squad. The sergeant said he met SANNS through SANNS' wife. On one occasion, the sergeant

18   was told by SANNS' wife that SANNS was part of a federal law enforcement agency she

19   described as a three letter acronym that starts with a "C."

20         10.    The sergeant described his interactions with SANNS; on two occasions he

21   wanted to do training with the sergeant's squad. Another time, SANNS invited the sergeant to

22   SANNS' wife's surprise birthday party. The sergeant attended the birthday party at SANNS'

23   residence. While the sergeant was leaving the party, SANNS asked if the sergeant wanted to see

24   SANNS' gun collection. The sergeant agreed and was taken down to the garage of the

1   residence and SANNS retrieved a plastic trunk from the back of the garage. Inside the trunk,

2   the sergeant saw numerous firearms including two rifles he described as "fully automatic."

3   SANNS confirmed to the sergeant that the rifles are in fact fully automatic. The sergeant

4   described the selector switch on the rifles and said he knows the difference between semi-

5   automatic and fully automatic. The sergeant also described seeing body armor and numerous

6   firearms suppressors in the residence. At one point, SANNS showed the sergeant a set of night-

7   vision goggles and even turned off the lights to show they worked.

8          11.    The sergeant told Detective Morris that on May 30, 2020, he contacted SANNS

9   to meet him at the police station so the sergeant could show SANNS some body armor they

10  previously discussed. SANNS arrived driving a black Chevy Tahoe displaying Texas license

11  plate ending in "DV," indicating it is a disabled veteran plate. A records check of the vehicle

12  revealed it is registered to SANNS and its registration is expired. The sergeant asked SANNS if

13  the license plate was a government plate and SANNS responded it was a government vehicle

14  and government license plates that don't come back to anyone. It was on this night the

15  activation happened where the sergeant and his squad were dispatched to the civil unrest at 7th

16  and Fremont. The sergeant mobilized his troops and headed to the staging location. The

17  sergeant told Detective Morris that when he was exiting the freeway, he saw SANNS black

18  Chevy Tahoe behind his line of vehicles with blue lights in the grill activated. The sergeant

19  arrived at the intersection of 8th and Ogden and again saw SANNS' black Chevy Tahoe and

20  observed SANNS dressing in body armor. The sergeant walked up to SANNS and, when

21  confronted, SANNS said his boss knew about him being there and was "OK" with his self-

22  deployment. The sergeant, still thinking SANNS was a federal law enforcement officer, saw

23  him walking around the area behind the "skirmish line." At one point, the sergeant said he saw

24  SANNS re-emerge and it appeared that he had been affected by the tear gas used by the

8

1    LVMPD SWAT Team at that time. SANNS then walked away. When the sergeant's team was

2    given the order to go back to the staging area, he saw SANNS again. After this sighting, the

3    sergeant did not see SANNS again for the rest of the night. The sergeant described SANNS as

4    having tactical body armor and a patch on the back that read "Federal Agent" as well as a

5    Department of Homeland Security patch on the front.

6         12.    Detective Morris received more pictures that the LVRJ the reporters took on

7    May 30, 2020. In these pictures, you can see the subject identified as SANNS wearing body

8    armor with a patch on the back of the vest that says "Federal Agent" as well as a "US

9    Department of Homeland Security" patch on the front. The rifle being carried is equipped with

10   what appears to be an Eotech holographic sight as well as a suppressor.

11        13.    Detective Morris checked with numerous Federal Law Enforcement partners and

12   confirmed SANNS is not an active federal employee or contractor. SANNS was enlisted in the

13   U.S. Marine Corps from January 2011 – April 2016. SANNS was a Department Of Defense

14   contractor for the U.S. Navy from December 2, 2019, to December 23, 2019.

15        14.    On June 9, 2020, law enforcement executed a search warrant on SANNS'

16   residence. The following items were located during the execution of the search warrant and

17   seized: 1) a tactical vest matching the one worn by SANNS in the LVRJ photographs, absent

18   the patches on the front and back; 2) a tactical belt matching the one worn by SANNS in the

19   LVRJ photographs, to include but not limited to a medical pouch, tourniquets, a taser, and

20   magazines; 3) a balaclava matching the one worn by SANNS in the LVRJ photographs; 4) a

21   gray t-shirt with a metal fabrication company logo matching the one worn by SANNS in the

22   LVRJ photographs; 5) a tactical helmet to include night vision goggles and attached hearing

23   protection bearing markings on the side reading "215"; 6) a Glock lower frame with rubber

24   bands matching the one worn by SANNS in the LVRJ photographs; and 7) a Glock upper slide

1   matching the one depicted on SANNS' side in the LVRJ photographs. Law enforcement was

2   also able to observe SANNS tattoos on his left arm and they matched those depicted in the

3   LVRJ photographs. Specifically, SANNS has a tattoos of the numbers "0351" with another

4   tattoo of the letters "SS" directly above.

5          15.    During the search warrant, law enforcement advised SANNS of his *Miranda*

6   rights and SANNS indicated he understood his rights. During a subsequent interview with law

7   enforcement, SANNS admitted to being present at the protest on May 30, 2020, but claimed he

8   never identified himself as a law enforcement officer. SANNS claimed he was present but

9   denied taking any part in the skirmish lines. When asked about being asked to leave the area by

10  any LVMPD personnel, SANNS had mentioned a LVMPD ranking officer thanked him for

11  being there. When asked if he is a federal agent or law enforcement officer, SANNS stated he

12  was an "off the books" contractor for a federal agency. SANNS stated he was at the police

13  station when the call was made for officers to respond to the protest on May 30, 2020, and had

14  asked the sergeant if they needed help. According to SANNS, the LVMPD sergeant responded

15  they could never turn down help from someone like SANNS. SANNS admitted to using his

16  personal vehicle to travel to 7th and Fremont streets on May 30, 2020, but denied activating

17  any emergency lights.

18  / / /

19

20  / / /

21

22  / / /

23

24  / / /

/ / /

1        16.    Based on the foregoing, your Affiant believes that there is probable cause to

2    believe that, on or about May 30, 2020, ZACHARY SANNS, committed the offense of False

3    Personation of an Officer or Employee of the United States, in violation of Title 18, United

4    State Code, Section 912.

5    I swear, under penalty of perjury, that the foregoing is true and correct.

6

7

8    DANIEL YUN

9    SPECIAL AGENT
     Bureau of Alcohol, Tobacco, and Firearms

10   Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
     telephone on 10th day of June, 2020.

11

12   Dated this 10th day of June, 2020.

13

14   UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24